UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DUSTIN RUOCCO

V.

DR. MINGZER TUNG, ET AL.

• PRISONER
• CIVIL NO. 3:02CV1443 (DJS)(TPS)
•
•
• FEBRUARY 5, 2004

## AFFIDAVIT

I, DUSTIN RUOCCO, being duly sworn, do hereby depose and say:

1. I am the plaintiff in the above entitled case, I make this affidavit in support of my answers and disputations of the defendants version of material facts and my objection to their Summary Judgment motion.

2. On September 20, 1996 my foot was accidently crushed by a multi-ton paving machine.

3. From September 20, 1996 through August 14, 1998 my primary care physician was DR. Tedd Weisman, During that time DR. Weisman treated me and had me evaluated and treated by DR. Robert Novicki, a Podiatry Specialist and DR. UpinderJi Sidhu, a anesthesia/pain Specialist.

1.

4.    I was prescribed the same type of opiod pain medication, Oxycodone, for the entire almost two years I was under the care of DR. Weisman. As any good physician should DR. Weisman informed me of the risks of taking narcotic pain medication.

5. DR. Robert Novicki, podiatry specialist, performed direct steriod injections in the intradigital spaces of my foot.

6. During this time the insurance company had two different independant medical evaluations done by their doctors, both agreed how serious the crush was, that the best line of care was being pursued and that I was on the appropriate pain medications.

7. DR. Upinderji Sidhu, anesthesia pain specialist at Milford Hospital, performed Lumbar sympathetic blocks (paravertebral nerve blocks) in the L-2 area of my spine twice, in attempts to block the nerve and ease my severe pain.

8. The second block done by DR. Sidhu left me with bad radiating pains in my entire right leg, which lasted about a month.

9. DR. Sidhu became my only treating physician from mid August, 1998 through the beginning of January 1999, I was continued on the same pain medications, oxycodone (i.e. oxycontin and percocet).

2.

10.    DR. Sidhu referred me to DR. Pardeep Sood, Pain Specialist at Comprehensive Pain and headache treatment center. On January 27, 1999 DR. Sood Took over as my Primary (only) Treating Physician.

11.    On January 27, 1999 DR. Pardeep Sood Performed a Thourough Physical and neurological examination of me from head to toe, evaluating and assessing my needs for future treatment plans.

12.    At that time it had been Two and a half years (2½) Since I Crushed my foot, although I tried every Procedure My doctors had recommended The only pain relief I was getting had been from the pain medications, which I had taken Since the day of my accident.

13.    DR. Sood added a neuropathic Medication, Neurontin, and Continued The pain medication regimen of Oxycontin and Percocet. DR. Sood discussed with me a trial procedure of spinal Cord Stimulation. I was given a video tape with information about This Procedure to take home and watch.

14.    The neuropathic medication, Neurontin, was added to The long standing medication regimen of Oxycontin and Percocet, It Was not in place of These medications. DR. Soods Notes and monthly records Clearly indicate This fact.

A. DMR 3.

15. I had Started a new Job and I would Not have full medical insurance coverage until mid October 1999 To cover The costs of this Procedure.

16. I was Continued on the same medication regimen while I worked so I would Have The insurance Coverage.

17. I wanted to make sure that my pain without The opiod Pain medication I had been on for over Two and a half years was So unbearable that this surgical Procedure in my spinal Column was absolutely warranted, Considering The Problem I had with The Second nerve block done by DR. Sidhu.

18. I decided, of my own accord, to go to a detoxification facility in June of 1999 To ensure I was safe and monitored coming off the opiod medication, I had been told not to ubruptly stop taking it, That it's dangerous.

19. I stayed in that detoxification facility for five days, so it was done safely and that is the only detoxification facility I have been to.

20. The information that I have been to "five detox facilities for opiate addiction and withdrawl", which this court wrote in one of its decisions is absolutely inaccurate And false. I voluntarily went to This one detox for five days only.

4.

21.  Unfortunately I was in extreme pain, making my daily activities impossible. I quickly realized I still very much needed to be on pain medication, I resumed the pain medication regimen immediately.

22.  I discussed with DR. Sood in July 1999 that I was still working light duty and I would have full medical insurance coverage in a few more months (mid. october 1999) and that in the coming winter months I would have to go ahead with the trial spinal cord stimulator, as the next attempt at easing my constant severe pain permanantly.

23.  I was continued on the same pain medications (i.e. oxycontin, Percocet, neurontin) which controlled my pain. At this point I had been taking the same type of medication. This was the last time I saw DR. Sood.

24.  I was unfortunately incarcerated before the planned spinal cord stimulator procedure could be performed by DR. Sood.

25.  From the beginning of January 1999 up until I was incarcerated I did not have insurance, I paid cash for my doctor's visits and my prescription medications.

5.

26.   I WAS Arraigned on august 25, 1999, at which time I informed the Judge of my ongoing serious medical needs and my need to Continue my longstanding Prescription Medication regimen. On the continuance mittimus generated that day, The Judge ordered That I am to receive my Prescription medications and medical attention, he ordered it written under the "Special Conditions" Section on that document That went to Bridgeport Correctional Center.

27.   On six different dates when I went to Court I explained my medical Situation to the Judge. The Judge Continuously ordered I Was to receive my Prescription medications And medical attention. This order was written on twelve of my continuance mittimuses from six different dates, They are in my master D.O.C. file. These orders were never honored.

28.   UPon my admission into Bridgeport Correctional Center I informed nurse Marianne Fuchs of my medical Conditions, needs and medication regimen. I told nurse Fuchs of the Court order, That I receive my medication which was written on my mittimus.

29.   Nurse Fuchs ordered I be Put in a strip Cell, no clothes, no boot or shoe to protect my foot. I told her how unsafe. Just Stopping my medication is, She disregarded the risks. Nurse Fuchs ignored The Court orders also.

6.

30.  When I was being transported during the day of my arraignment I somehow scratched my wrist and forearm. This was done accidentally by moving in the hand cuffs and chains These scratches were superficial and not intentionally done.

31.  I was extremely sick from not having or being given my medications for over twenty four hours, I was suffering in severe pain and in a strip cell with no protective boot on my foot.

32.  I gave Nurse Fuchs the name of my doctor, Dr. Sood I told her the phone number to contact him, I also told her which pharmacy I use. This was not verified.

33.  It is documented in my D.O.C medical file, Dr. Sood's office was contacted and my medications were verified on September 1, 1999. I was still denied my medications.

34.  I was not examined by medical doctor Steven Stein until October 6, 1999. That was a cursory exam where he ordered a x-ray. I requested to sign medical releases of information so he could get my medical records. He never got them.

7.

35. DR. STein never did a good examination, Never took a medical history and did not listen to what treatments were tried and what medications were helpful, he ordered I take motrin and made me leave his office.

36. DR. Stein substituted motrin for oxycontin and Percocet and Neurontin For The plaintiffs Serious pain. This Treatment is so grossly inadequate it amounts to no treatment at all.

37. I submitted written requests daily To be seen by DR. Stein, They went unanswered. He never got my medical records from my private doctors.

38. Once my broken bones and skin healed all The doctors who treated me for this traumatic injury had the same objective which was and still is, repairing the nerve damage which has been irreparable to date and controlling my constant severe Pain, so I do not unnecessarily suffer.

39. My Constant severe pain and Serious medical needs have not changed because I am incarcerated, I have not miraculously healed. I am still in constant Pain and putting pressure on my foot, Just walking increases my pain.

8.

40. When I was transferred to Garner Correctional institution on or about February 9, 2000 I informed correctional officer William Smith of my need for the orthopedic boots, which I have needed since I was able to walk after my accident.

41. Correctional officer William Smith said my need for these orthopedic boots is not his problem nor did he care. c/o Smith sent both pairs of my orthopedic boots home, he even refused to check with the medical department first.

42. It was only about seven (7) months from my last appointment with DR. Sood, July 7, 1999 to DR. Tung first saw me February 23, 2000 NOT one year as his sworn Affidavit states. (see Tungs Affidavit)

43. On January 27, 1999 DR. Sood Added neurontin, a neuropathic medication to my medication regimen of oxycontin 40mg three times a day and up to five percocet as needed per day. DR. Sood kept me on this same regimen right up to the last time I saw him July 7, 1999. DR. Sood never indicated, mentioned, or wrote in his notes anything about the elimination of this narcotic regimen, except of course if the spinal cord stimulator procedure took away my pain I would not need to take medication for pain. DR. Tungs Affidavit is a subterfuge to this court. (see DR. Soods records and DR. Tungs Affidavit)

9.

44. The extensive nerve damage done to my foot and serious pain has remained unchanged for years and untreated my severe pain is overbearing and incapacitating.

45. DR. Tung never gave more than a cursory look at my foot, he never put on medical gloves and performed an examination on my foot, he never touched it.

46. I requested to sign and did sign releases of information on at least Three (3) occasions, so DR. Tung could get and review my private physicians records, which he agreed to do.

47. My medical records were never sent for or obtained by DR. Tung or any other D.O.C. Staff.

48. I finally brought all my copies of my medical records when I went to see DR. Wright. DR. Wright made copies of everything for his review and to put in my file.

49. I first examined by DR. Wright on February 4, 2001, at which time he made his diagnosis, he prescribed Tylenol #3 and flexiril and ordered I return to see him in one week.

50. I returned to see DR. Wright on February 10, 2001, he continued the same medications for Thirty (30) Days.

10.

51. I was seen a few times by DR. Tung in 2000. DR. Tung never examined my foot, he wrote unfounded libelous entries in my D.O.C. medical file And wrote That their was no medical indication for me To have a bottom bunk PASS or orThopedic footwear.

52. EAch time I went to See DR. Tung he would re-write almost The exact Same notes, naming a very Painful Condition, adding libel and making up Things I did not ask for. (see DOC medical file)

53. DR. Tung ordered me To Take NaProsyn, and outrageous amounts of Tylenol and MoTrin, Knowing it did not help my Severe pain and was bad for me.

54. I Did-not receive Proper medical care commensurate with modern medical science or standards of decency. The level of Medical care That was needed To prevent me from Constantly Suffering was very Clear and well documented and I was denied These easily obtainable Things such as pain relief, orThopedic boots and even a bottom bunk PASS. DR. Tung Deliberately made me Suffer in Constant PAin.

11.

55. I was prescribed Tylenol #3 by DR. Tung for my foot pain only one time on November 28, 2000 for seven (7) days Three Times a day at That Time I was also given arch cushions. (Simalar To what can be Bought in a grocery store), I however, did not have a arch problem or adequate footwear. (see medical file and Tungs Affidavit)

56. On February 10, 2001 DR. Wright clearly wrote in my D.O.C. medical file on a "Physicians orders" page The order for supportive orthopedic shoes. DR. Wright Signed and stamped This order. (see exhibit) DR. Wright is lying in his Affidavit To This Court To Cover for DR Tung (see DR. Wrights Affidavit)

57. The February 10, 2001 order for orthopedic shoes by DR. Wright was so clearly written. A nurse reiterated The order The same day on a "clinical record" Page of my D.O.C. medical file, which states "MD. orders noted" Letter sent to B-block C.T.O. Re: MD. orders for orthopedic Supportive shoe from family Per custody approval" (see exhibit)

58. DR. Wright is Covering for DR. Tung by lying and misleading The Truth in his Affidavit. (see Wrights Affidavit)

12.

59. I was ordered a bottom bunk pass by DR. Wright on March 10, 2001, at which time he seemed surprised that I did not have a bottom bunk PASS, This pass was for two months then re-evaluate.

60. On may 26, 2001 DR. Wright re-ordered my bottom bunk pass, This order was permanent, I had no time limitation. This is clearly written in my D.O.C. medical file.

61. I was seen by DR. Tung on may 21, 2001, five days prior to seeing DR. Wright. DR. Tung denied my request to re-order my bottom bunk pass "due to no medical indication". In addition DR. Tung wrote that I said he needs to give me Percoden, Vicoden or oxycoden - Naming a painful Condition "Post Traumatic Polyneuropathy" (see exhibit of DR. Tung And DR. Wrights orders on same page)

62. I have Never been on Percoden or Vicoden I have never taken either of these medications, I never asked for them I do not know what they are.

63. I was seen by DR. Wright on march 24, 2001, at which time he again prescribed Tylenol # and flexiril for my pain, Which helped a little.

64. I went to "medication call" on monday march 26, 2001, I was told DR. Tung discontinued the Tylenol #3 and flexiril ordered two days prior by DR. Wright. (see exhibit)

13.

65. When I informed DR. wright on may 26, 2001 That DR. Tung had cancelled The orders for pain medication he wrote The last time I saw him on march 24, 2001. DR. wright expressed anger and displeasure with DR. Tung's interference in his Treatment plan. He was not aware of this incident and he was going to look into it. ~~See~~ DMR.

66. my repeated requests to see DR. wright were ignored. I finally got To see him on October 7, 2001

67. On october 7, 2001 DR. wright went over all my medical records with me. DR. wright Told me That he "needed a leg to Stand on" That DR. Tung was interfering and He was going to speak with administrators. He ordered I return to see him in one week.

68. I was Called on october 28, 2001 for The follow·up from october 7, 2001. DR. wright put a request f in for me To be Evaluated To The URC. (Utilization Review Committee). He again said "He needed a leg To stand on" and This was How He would have To get That.

69. I was called on November 18, 2001, DR. wright told me of URC's Denial of his request. He ordered I return in one week that he would have a plan and That his hands are tied because of DR. Tung's interference. He needs another doctor's evaluation Consistent with his To Justify his actions and over ride DR. Tung.

14.

70. I was called on November 27, 2001 and December 10, 2001 to see Dr. Wright. Dr. Wright examined me and noted the pain and tenderness. He again told me that Dr. Tung's interference is prohibiting him from ordering adequate narcotic pain medication. He ordered flexiril then added nafrosyn, which did not help in the past, but he said to try it again. Dr. Wright submitted another U.R.C. request. This request was also denied.

71. I was seen again by Dr. Wright on January 25, 2002. We went over his previous U.R.C. requests and realized he made writing errors in his prior requests. Dr. Wright wrote another U.R.C. request and corrected the wording mistakes. This request was granted to see a podiatry specialist.

72. On February 26, 2002 I went to see podiatry specialist Dr. Fedus. Dr. Fedus performed a thourough examination and clearly stated his findings of crushed nerve sheaths with excessive dendrites and damage to nerve sheath with flaring of nerve endings.

73. Dr. Fedus was consulted for recommendations only not treatment. He recommended I get a full length functional orthotic shoe and that "the use of appropriate (opiod) analgesics" together with orthotic will allow me to function in population with minimal symptoms. (see exhibit)

15.

74. DR. Fedus also educated me about a INVASIVE NERVE CAP operation. However, all my private physicians had advised against Invasive operations on my foot because it was a crush injury and The diffuse nerve damage.

75. This operation was Never offered To me, I was only Told about it by DR. Fedus as something To Consider.

76. DR. Fedus Told me at The Consultation That he was only supposed To document his findings and make recommendations He said He Could not order any Treatments or Medications.

77. I had been told by DR. Tung for over Two years at This Point That I had no medical need for and DO - NOT need any kind of orthopedic or special footwear,

78. DR. Tung ordered I get special orthopedic footwear on or About February 27, 2002 This was ordered Immediately following my Podiatry Consult with DR. Fedus, DR. Tung said I had no need for orthopedic footwear and denied my requests for over Two years, He Then orders Them. (see exhibit)

79. DR. Tung refused To follow DR. Fedus' recommendation for Appropriate opiod Pain medication, which, had been Confirmed as necessary by every other Physician who examined me including DR. Fedus But DR. Tung still said I Did not need it.

16.

80. I was called to see DR. Wright on April 19, 2002, he reviewed DR. Fedus' findings. DR. Wright said he now had A "leg to stand on" And he could override DR. Tung. DR. Wright again ordered Tylenol #3 and flexiril and that I am to return to see him in two weeks to re-evaluate if this is adequate medication now that he had another physicians concurring opinion on my needs, he was going to look into medication more comparable to the medication I had been taking prior to my incarceration.

81. I did not see DR. Wright after April 19, 2002, He was transferred to another facility.

82. DR. Wright knew there was a serious medical problem with my foot and that is why when DR. Tung interfered with his prescribed treatment he continuously pushed by submitting numerous requests to U.R.C. and making telephone calls on my behalf until I was approved to be seen by DR. Fedus.

83. Special orthopedic boots, just as store bought boots or state issue boots can be used as a weapon or to conceal contraband. So the statement in DR. Wrights Affidavit to this Court is another blatant subterfuge made in bad faith to cover for DR. Wrights colleagues in this matter.

17.

84. In my D.O.C. Medical file It can be seen that what DR. Wright has now stated in his sworn affidavit is Totally Contrary to what his actual Prescribed treatment was, what his plan was for me and what his notes indicate.

85. It is my opinion that the Sworn affidavits Submitted by DR. Wright, DR. Tung and DR. Giarratana were made in a Collaborative effort to mislead this Court by a misrepresentation of the facts, This was done To Cover for DR. Tung and Their other Colleagues who violated my Constitutional Rights. (see DR. Wrights, DR. Tungs and DR. Giarratanas Affidavits)

86. Documented throughout my medical history is that Stairs for me are difficult and Cause great pain even with my medically needed orthopedic boot, So being made by DR. Tung To Climb a steel rung ladder or up on a chair To get up and down to a top bunk without causing unnecessary severe pain is inconceivable. Particularly, Seeing that I usually would not wear Shoes to bed and I would be barefoot.

18.

87. I had such a well documented medical history a planned surgical procedure and a strict treatment plan in place, from the cumulative efforts of four specialists. It is not the best judgment and knowledge of a trained physician to deviate from that treatment plan and not carry-out the planned surgical procedure when the physicians never even conducted more than a cursory examination.

88. This shows deliberate indifference to my serious medical needs, not the best judgment and knowledge of a trained physician or physicians.

89. When I was seen by Dr. Giarratana he had already been told dictatorially by Dr. Tung that he could not treat my serious pain with narcotic pain medication.

90. Dr. Giarratana never even gave a cursory look at my foot, I was not in Dr. Giarratana's presence for even one minute. He said he would review my chart and make a determination, without performing an examination of his own. This too is not the best judgment and knowledge of a physician being exercised.

19.

91. DR. Giarratana could not have done a complete review of my medical records, as his affidavit states, because my medical records clearly show a serious medical Problem and the need for Pain management. (see Affidavit of DR Giarratana)

92. DR. Giarratana wrote an order for Tylenol for my Severe Pain. He ordered Two 325 mg. Tablets every (4) four hours, Thats (12) Twelve Pills a day or (3900) Three Thousand Nine hundred - milligrams a day. That Can-not be Healthy and did Absolutely nothing To ease my Pain, He never DWR examined me at all.

93. DR. Giarratana was dictated to by DR. Tung, Just as DR. Tung did with DR. Wright. DR. Tung Prohibited DR. Giarratana from adequately Treating me and DR. Tung Interfered with The Prescribed treatment of DR. Wright, Then Prohibiting him from adequately Treating me. DR. Wright overrode DR. Tung after I was evaluated by DR. Fedus, Using his own Judgment.

94. When I was a Pre-Trial detainee in 1999 I was Seen by DR. Berkowitz a PSychiatrist, he Kept Prescribing mental health medications To Substitute for The Pain medications I was being denied, These medications were given To Knock me down and Put me To Sleep, given in response To my Complaints of Pain.

20.

95. The D.O.C. uses a number system (1) one through (4) four to assess an inmates medical needs (1) one being the lowest or no medical problems, (4) four being the highest or most serious medical needs.

96. On August 27, 2003 I was Transferred from Garner CI To Osborn CI, on my "Transfer Summary" of my current health status Dr. Tung and Health Services Administrators at Garner CI had my medical needs score a number (1) one the lowest possible or no medical needs.

97. Osborn CI Doctors and Health Services administrators quickly raised my medical needs score To a (3) Three almost The highest and my medical needs score is still a (3) Three indicating Serious medical needs.

98. I was Immediately Issued a bottom bunk Pass at Osborn CI. On August 27 2002, The head doctor Dr. Gittzus made it Permanently Approved on September 19, 2002.

99. I was Also Issued a Permanent "Bottom Tier Pass" at Osborn CI, I Am not To Go up or down any stairs while I Am at Osborn CI and I must Be accomodated By Custody Because of my medical Issues

21.

100. I was first seen by DR. Pillai at Osborn CI. on September 27, 2002. DR. Pillai examined my foot and Immediately prescribed Tylenol #3 (2) Two Tablets (3) Three Times a day and my medical records were going to be reviewed.

101. On November 16, 2002 I was called to be seen by DR. Pesanti, who happened to be the doctor that DR. wright had contacted to get me approved by The U.R.C, so He knew of me, DR. Pesanti thouroughly examined my foot and went over my medical records from my Private physicians and D.O.C including DR. Fedus' recommendations.

102. DR. Pesanti issued me a cane to help me walk, He re-started the Same Type of Pain medication I was on prior to being incarcerated, oxycodone, He prescribed for me oxycontin 20 mg Twice a day and Tylenol #3 (2) Two Tablets Three Times a day and He ordered a strong Anelgesic cream, Capsaicin 0.075%

103. DR. Pesanti called me to see him again on December 27, 2002, He raised The oxycontin to 40 mg Twice a day and re ordered the Tylenol #3 and Capsaican cream The same. He raised The oxycontin because I was Taking 40mg Before I was incarcerated Three Times a day He and I agreed Twice a day was Sufficient, at This Time.

22.

104. When Dr. Pesanti wrote this prescription on December 27, 2002, he ordered these medications for (6) six months, re-affirming my need for a long-term pain management plan.

105. My constant severe pain and serious medical needs did not miraculously disappear when I became incarcerated, then reappear years later. I was cruelly, unnecessarily and deliberately made to constantly suffer.

106. After intentionally interrupting the long standing pain medication regimen I was taking at the time of my incarceration, making me suffer in agony for about (3) three years, then restart almost the exact pain medication regimen I was on at the time of my incarceration, only affirms I really needed to be given that medication all along to prevent the unnecessary suffering I was forced to endure at the hands of the defendants.

107. Dr. Pesanti was transferred to another DOC facility and Dr. Pillai was going to see me instead.

108. On July 3, 2003 I was seen by Dr. Pillai, he examined me and renewed the same medications, that were ordered on December 27, 2002, oxycontin 40mg twice a day - Tylenol #3 two tablets three times a day and Capsaicin cream, the order was written for (6) six months again

23.

109. IN December, 2003 DR. Pillai renewed The same medications again.

110. I am still on The same medications That were restarted on December 27, 2002.

111. When I was not given The Pain medication I had alot more difficulties walking so I had gained approximately (40) forty or (50) fifty Pounds. Since I was restarted on The appropriate Pain medication and I can walk somewhat better I have lost all The excess weight I had gained.

112. I filed several Grievances while I was at Garner C.I., many went unanswered and unaccounted for. I've been Told That Certian Grievances may Not be appealed and Another was Completed but "due To Clerical error" was not returned for over a month and a half.

113. When I would inquire about unanswered and unaccounted for Grievances, Those requests and letters of inquiry would also go unanswered, as would Other letters mostly To medical Administrators. and staff.

24.

114. When I was Transferred To osborn CI, I had a Level 3 Grievance pending at Garner. I wrote To The health services administrator at osborn asking him To Try To Track it down, This request Went Unanswered.

115. I wrote To mrs Hughes chns at osborn and asked if she could get me the answer and a Copy of This Grievance. mrs. Hughes Called and E-mailed Health services administrator Helen Dorsey at Garner on a few different occasions and requested a response To my Level 3 Grievance. mrs. Hughes has Told me Helen Dorsey has never answered my Grievance and I would not be getting a response (see Inmate request mrs Hughes chns)

116. I have done everyThing required of me to exhaust Administrative remedies, If D.O.C. officials do-not answer and do-not follow The rules Pursuant to Their own Administrative Directives There is nothing I can do, I have fulfilled what is required of Me.

117. I had even gotten a response from Nursing Supervisor Roberta Leddy written on a request stating That MY C.TO will be happy To help me get legal documents To File if I don't like my Treatment.

25.

118. I was Treated with deliberate indifference To my serious medical needs by The defendants named in This suit.

119. AT all Times relevant To This Complaint, I did noT receive proper medical care consistenT with The Standard of Care, and modern medical science, of Practicing Physicians in The State of ConnecTicuT.

120. I was maliciously Denied Medical Care necessary To Prevent The extreme suffering I was made To endure by The defendants in This suit.

The foregoing is all True and accurate To The best of my Knowledge and belief.

DUSTIN RUOCCO

Subscribed and Sworn to before me this _17th_ day of _Februar_, 2004

NOTARY PUBLIC
My Commission Expires Mar 31, 2005

NOTARY PUBLIC