UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


DUSTIN RUOCCO                    :
                                :           PRISONER
        v.                      :    Case No. 3:02cv1443(DJS)
                                :
MINGZER TUNG, et al.[1]         :


**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Dustin Ruocco ("Ruocco"), currently is confined at the Osborn Correctional Institution in Somers, Connecticut. He was under the custody of the Connecticut Department of Correction as a pretrial detainee and then as a sentenced inmate during the time period relevant to this action. Ruocco alleges that the defendants were deliberately indifferent to his serious medical needs in that they denied him the medications prescribed by his personal physician prior to his incarceration and denied him a boot fitted with an orthopedic device. Defendants have filed a motion for summary judgment. For the reasons that follow, defendants' motion is granted in

---

[1]The named defendants are: Mingzer Tung, J. Berkowitz, Marianne Fuchs, Steven Stein, Giovanny Gomez, Wayne Sparks, John Lahda, Helen Dorsey, Roberta Leddy, Trudy Evans, Joan Dobson, William Smith, Giarrantana and Carson Wright.

part and denied in part.

I.   Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Rule 56(c), Fed. R. Civ. P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'"  Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

To defeat a motion for summary judgment that is supported by documentary evidence and sworn affidavits, a plaintiff "must do

more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  He "must come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir.1992) (citation and internal quotation marks omitted).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).  See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.  Facts[2]

Ruocco's right foot was crushed in a work-related accident in 1996.  Specifically, Ruocco sustained a severe crush injury to his right foot, which broke his foot and certain toes in various places.  Prior to his incarceration, Ruocco was treated by various physicians with pain management procedures and narcotic medications.  In an effort to manage his pain, Ruocco owned two pairs of orthopedic footwear, which had full length orthotic inlays preventing Ruocco's toes from moving when he walked.

Ruocco alleges that defendants denied him proper medical treatment at both the Bridgeport Correctional Center ("BCC") and the Garner Correctional Institution ("Garner").  Steven Stein was a physician at the Bridgeport Correctional Center ("BCC").  J. Berkowitz was a psychiatrist at BCC.  Marianne Fuchs was a nurse at BCC.  Minzger Tung was the primary care physician at Garner.  Carson Wright was a physician who worked at Garner for a period of time while Ruocco was imprisoned there.  Glenn Giarrratana is a physician who worked at Garner during the spring and summer of

---

[2]The facts are taken from defendants' statement of material facts in support of their motion for summary judgment [doc. #47], the affidavits of defendants Giarratana, Wright and Tung [docs. ##44-46], Ruocco's affidavit and the exhibits attached to his statement of disputed facts [incorporated in doc. #65] and the copy of Ruocco's medical records filed with defendants' opposition to Ruocco's motion for preliminary injunctive relief [doc. #28].  In his opposition papers, Ruocco asks the court to review the copy of his medical records previously filed.  This request is granted.

2002. Roberta Leddy, Trudy Evans, and Joan Dobson were nurses at Garner. Each of these health care workers treated Ruocco while he was incarcerated. Giovanni Gomez, Warden; Wayne Sparks, Administrative Major; Helen Dorsey, Health Services Administrator; John Lahda, Treatment and Programs Major; and William Smith, Correction Officer; were all employed at Garner during the time of Ruocco's incarceration at Garner.

In August 1999, Ruocco entered BCC as a pretrial detainee. Upon admission, he was treated for narcotics withdrawal. He was treated by the institutional psychiatrist and referred to the medical department for medical care relating to his foot.

Defendant Stein treated Ruocco in 1999, when he was confined at BCC. Defendant Stein prescribed Motrin for pain and ordered an x-ray of Ruocco's right foot. The October 1999 x-ray was negative; it indicated no fracture or dislocation and no indication of an old fracture.

In the mittimus remanding Ruocco to the custody of the Connecticut Department of Correction, the state court judge noted that Ruocco should receive medication and medical attention. Ruocco construed this notation to mean that he should receive the same medications he was taking before he was incarcerated.

When Ruocco was transferred to Garner, he was not permitted to retain his orthopedic footwear. When Ruocco asked that his family be permitted to send him the footwear, defendant Sparks

told Ruocco that institutional policy precluded inmates receiving any items from family members.  Defendant Sparks told Ruocco that to obtain orthopedic footwear, the institutional doctor must determine that the footwear was medically necessary and issue an order for the footwear.  If the order was approved by the review board, Ruocco would be sent to a specialist, who would obtain the proper footwear and issue the footwear to Ruocco through the medical department.

Defendant Tung first provided treatment to Ruocco in February of 2000.  Following his conviction in March of 2000, Ruocco was transferred to MacDougall-Walker Correctional Institution in Suffield, Connecticut, where he was diagnosed with polysubstance dependence.  Ruocco returned to Garner in April of 2000.

Despite Ruocco's contrary contention, medical records reveal that defendant Tung requested and reviewed Ruocco's pre-incarceration medical records.  Those records indicated that Ruocco had deferred alternative pain treatment in favor of continued use of Oxycontin and Percoset.[3]  In May 2000, defendant Tung requested a neurology consult.  The Utilization Review Committee denied this request and recommended continued

---

[3]Ruocco states in his affidavit that he deferred other treatment because he had started a new job and was waiting for medical coverage to begin.  The medical records mention that Ruocco wanted to wait for the slow season to undergo the alternative treatment.

conservative treatment.  Defendant Tung did not think Ruocco required a bottom bunk pass or orthopedic footwear.

On several occasions, defendant Tung prescribed narcotic pain medication for Ruocco.  He did not, however, prescribe the same medications Ruocco had taken prior to incarceration.  Ruocco had not seen his pre-incarceration physician for one year when defendant Tung first treated Ruocco.  In addition, defendant Tung relied on a treatment note indicating that the pre-incarceration physician was concerned about drug dependency and wanted to eliminate reliance on narcotics.

In February 2001, Ruocco began to be treated by defendant Wright.  Defendant Wright diagnosed a possible third nerve neuroma of the right foot and prescribed Tylenol #3 and Flexeril. He did not order orthopedic footwear for Ruocco.  Instead, he stated that he would not object to Ruocco wearing his own orthopedic footwear if Ruocco obtained the warden's approval. Defendant Wright issued Ruocco a temporary bottom bunk pass.

In March 2001, defendant Wright spoke with defendant Tung about Ruocco's treatment.  They agreed that Ruocco should not continue to take Tylenol #3, a narcotic.  Following that conversation, defendant Tung changed Ruocco's medication from Tylenol #3 to Tylenol without codeine.  Ruocco contends that defendant Tung interfered with defendant Wright's treatment and would not permit defendant Wright to continue treating Ruocco in

7

accordance with his medical opinion.

In October 2001, defendant Wright requested a neurological study. The Utilization Review Committee denied this request in early November 2001 and recommended continued conservative treatment. Later that month, defendant Wright noted that Ruocco displayed increased tenderness while walking and prescribed Flexeril, a muscle relaxant. In December 2001, defendant Wright prescribed Naproxen, a non-steroid, anti-inflammatory medication. Also in December 2001, defendant Wright requested a neurological study. The Utilization Review Committee denied this request, again recommending continued conservative treatment.

In January 2002, defendant Wright requested a podiatry and orthopedic examination. In February 2002, the Utilization Review Committee approved the request for a podiatry examination. Ruocco was examined by a podiatrist in late February 2002. The podiatrist recommended a full length orthotic, which would be inserted in a shoe; consideration of appropriate analgesics, i.e., narcotic medication; and consideration of a nerve block to relieve pain without the need for narcotic medication. Ruocco rejected any nerve block treatment.

After the podiatry consultation, defendants Wright and Tung considered, and again rejected, the use of narcotic medication. They determined that long-term use of narcotic medication was not medically appropriate and prescribed non-steriods for pain and

muscle relaxants.  Defendants Wright and Tung agreed with the podiatrist's recommendation for a full-length functional orthotic device that would prevent movement of Ruocco's toes.  The orthopedic footwear was obtained in April 2002.

During the spring and summer of 2002, defendant Dr. Giarrantana replaced defendant Wright and treated Ruocco at Garner.  Defendant Giarrantana did not consider use of narcotic medications to be medically appropriate and ordered Tylenol for Ruocco's pain.

In August 2002, Ruocco was transferred from Garner to Osborn Correctional Institution in Somers, Connecticut.  He has been issued a permanent bottom bunk pass and currently has been prescribed opiod medication comparable to that which Ruocco was taking prior to incarceration.

III. <u>Discussion</u>

Ruocco includes eleven causes of action in his complaint: (1) violation of the Fourteenth Amendment due process rights of a pretrial detainee; (2) failure to honor court orders; (3) failure to take a history and obtain medical records; (4) failure to accommodate for known disability by taking away Ruocco's orthopedic footwear, ADA violations; (5) deliberate indifference to serious medical needs; (6) violation of Eighth Amendment proscription against cruel and unusual punishment by unnecessary and wanton infliction of pain; (7) denial of access to specialist

qualified to exercise judgment regarding his condition for over two years; (8) failure to follow specialist's recommendations; (9) intentional interference with medical judgment for non-medical reasons; (10) intentional interference with prescribed treatment plan; and (11) failure of supervisory officials to investigate and take remedial action in response to letters.

Defendants assert five grounds in support of their motion for summary judgment: (1) defendants were not deliberately indifferent to Ruocco's serious medical need; (2) Ruocco fails to state a claim under the Americans with Disabilities Act; (3) defendants are protected by qualified immunity; (4) defendants are immune from suit on Ruocco's state law claims; (5) the Eleventh Amendment bars any claims for damages against defendants in their official capacities; and (6) Ruocco has failed to exhaust his administrative remedies as to the non-medical treatment claims.

A.    Eleventh Amendment

Defendants argue that any claims seeking damages from any defendant in his or her official capacity must be dismissed. Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment.  See Florida Dep't of State v. Treasure Salvors, 458 U.S. 670, 684 (1982).  Section 1983 does

10

not override a state's Eleventh Amendment immunity.  <u>See</u> <u>Quern v.</u>
<u>Jordan</u>, 440 U.S. 332, 342 (1979).  The Eleventh Amendment
immunity which protects the state from suits for monetary relief
also protects state officials sued for damages in their official
capacity.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159 (1985).  A suit
against a defendant in his official capacity is ultimately a suit
against the state if any recovery would be expended from the
public treasury.  <u>See</u> <u>Pennhurst State Sch. & Hosp. v. Halderman</u>,
465 U.S. 89, 101 n.11 (1984). Therefore, the motion for summary
judgment is granted to the extent that the complaint may be
construed as seeking damages from the defendants in their
official capacities on Ruocco's civil rights claims.

    B.   <u>Exhaustion of Administrative Remedies</u>

    Defendants also argue that Ruocco failed to fully exhaust
his administrative remedies with regard to his claims that are
unrelated to medical treatment.

    The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a),
requires an inmate to exhaust "administrative remedies as are
available" before bringing an "action . . . with respect to
prison conditions."  The Supreme Court has held that this
provision requires an inmate to exhaust administrative remedies
before filing any type of action in federal court, <u>see</u> <u>Porter v.</u>
<u>Nussle</u>, 534 U.S. 516, 122 S. Ct. 983, 992 (2002), regardless of
whether the inmate may obtain the specific relief he desires

through the administrative process.  See Booth v. Churner, 532
U.S. 731, 741 (2001).

The administrative remedies for the Connecticut Department
of Correction are set forth in Administrative Directive 9.6,
entitled Inmate Grievances.  During the relevant time period,
section 6(A) provided that the following matters were grievable:

> 1.  The interpretation and application of
>     policies, rules and procedures of the
>     unit, division and Department.
> 2.  The existence or substance of policies,
>     rules and procedure of the unit,
>     division and Department . . . .
> 3.  Individual employee and inmate actions
>     including any denial of access of
>     inmates to the Inmate Grievance
>     Procedure other than as provided herein.
> 4.  Formal or informal reprisal for use of
>     or participation in the Inmate Grievance
>     Procedure.
> 5.  Any other matter relating to access to
>     privileges, programs and services,
>     conditions of care or supervision and
>     living unit conditions within the
>     authority of the Department of
>     Correction, to include rights under the
>     Americans with Disabilities Act, except
>     as noted herein.
> 6.  Property loss or damage.

Disagreement about medical treatment was specifically excluded
from the list of grievable items.  See Administrative Directive
9.6, section 6(B)(6).

The Second Circuit considers the failure to exhaust
administrative remedies an affirmative defense.  "A defendant in
a prisoner § 1983 suit may also assert as an affirmative defense
the plaintiff's failure to comply with the PLRA's requirements

[that plaintiff first exhaust all administrative remedies]."
Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999).  By
characterizing non-exhaustion as an affirmative defense, the
Second Circuit requires the defendants to present proof of non-
exhaustion.  See also Reyes v. Punzal, 206 F. Supp. 2d 431, 433
(W.D.N.Y. 2002) ("[I]n the Second Circuit, failure to comply with
the PLRA's exhaustion requirement is viewed as an affirmative
defense . . . and . . . defendant bears the burden of proving
plaintiff's failure to comply with the exhaustion
requirement")(citations omitted); Hallett v. New York State Dep't
of Correctional Serv., 109 F. Supp. 2d 190, 196-97 (S.D.N.Y.
2000) (same).

     In their motion for summary judgment, defendants state that
Ruocco "does not allege he fully exhausted the grievance
procedure and records of the Department of Correction do not
indicate he has fully exhausted these grievances."  They have not
provided any copies of grievances filed and an affidavit from the
grievance coordinator to support this statement.

     The court concludes that defendants have failed to meet
their burden of proving that Ruocco did not exhaust his
administrative remedies with regard to all claims subject to the
exhaustion requirement.  Thus, the defendants' motion for summary
judgment is denied on this ground.  Defendants may reassert this
claim at trial.

C.   Americans with Disabilities Act

Defendants contend that Ruocco fails to state a claim for relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.

The State of Connecticut is a public entity within the meaning of the ADA.  See 42 U.S.C. § 12131(1)(A)(defining public entity to include any state or local government).  Although Ruocco does not name the State of Connecticut as a defendant, the Second Circuit has recognized that a valid ADA claim may be stated against a state official in his official capacity.  See Henrietta D. v. Bloomberg, 331 F.3d 261, 289 (2d Cir. 2003).  The defendants in this case are all state employees.  Thus, Ruocco may validly state an ADA claim against the defendants in their official capacities.

Title II of the ADA, entitled "Public Services," provides, in relevant part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Title II defines the term "qualified individual with a disability" as "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or

14

activities provided by a public entity." 42 U.S.C. § 12131(2).

The Second Circuit has held that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 111 (2d Cir. 2001). The court noted that the plaintiff could establish discriminatory animus or ill will by a burden-shifting technique similar to that adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), or a motivating-factor analysis similar to that adopted in Price Waterhouse v. Hopkins, 490 U.S. 228, 252-58 (1989). In Garcia, however, the Second Circuit affirmed the grant of summary judgment in favor of the defendants on the ADA claim because the plaintiff failed to allege discriminatory animus or ill will due to his disability. See Garcia, 280 F.3d at 112-13.

Ruocco's ADA claim is based upon his allegation that his orthopedic footwear was taken from him when he arrived at Garner Correctional Institution and was not returned. Ruocco has not identified what Department of Correction service, program or activity from which he was excluded, of which he was denied the benefits, or in which he was unable to participate. To the extent that he challenges the long delay in providing new orthopedic footwear, he has identified only a delay. Thus,

Ruocco has not alleged facts sufficient to state an ADA claim and has not, in opposition to defendants' motion, provided evidence demonstrating facts to support an ADA claim.[4]  In addition, Ruocco has provided no evidence to show a discriminatory animus or ill will due to his disability as required under Garcia.  He alleges only that defendant Tung did not believe his complaints of pain and did not heed his requests for orthopedic footwear. Ruocco alleges that defendants Smith and Sparks refused to violate institutional policy to permit him to obtain orthopedic footwear from his family.  These allegations of ill will and discriminatory animus are insufficient because they do not tend to show that defendants' conduct was motivated by discrimination. Thus, defendants' motion for summary judgment is granted as to Ruocco's ADA claim against defendants in their official capacities.

Roucco does not bring his ADA claims against the defendants in their official capacities only.  Thus, the court must consider the viability of the ADA claims against defendants in their

---

[4]In his memorandum, Ruocco argues that he "was not allowed in the gym at all because of his foot and shoes further he could not participate in any outdoor activities."  (Pl.'s Mem., Doc. #65, at 30).  However, Ruocco may not amend his complaint through a memorandum of law.  See Natale v. Town of Darien, No. CIV. 3:97CV583 (AHN), 1998 WL 91073, at *4 n. 2 (D. Conn. Feb. 26, 1998) (holding plaintiff may not amend complaint in memorandum of law) (citing Daury v. Smith, 842 F.2d 9, 15-16 (1st Cir. 1988)); Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 987 (S.D.N.Y. 1989) (same).

individual capacities.  Although a state or local government, or
subdivision thereof, is included within the definition of public
entity, see 42 U.S.C. § 12131(1)(A), specific public employees
are not.  Title II of the ADA does not "provide[] for individual
capacity suits against state officials."  See Garcia, 280 F.3d at
107.  Accordingly, defendants' motion for summary judgment is
granted as to the ADA claims against the defendants in their
individual capacities as well.

       D.    Deliberate Indifference to Serious Medical Needs

       The time period relevant to this action encompasses a period
when Ruocco was a pretrial detainee, from August 1999 through
March 3, 2000, as well as a later period following his
conviction.  The rights of sentenced inmates are governed by the
Eighth Amendment's prohibition against cruel and unusual
punishment.  The rights of a pretrial detainee are governed by
the Due Process Clause of the Fourteenth Amendment.  See Bell v.
Wolfish, 441 U.S. 520, 535 & n.16 (1979).

       With regard to convicted inmates, deliberate indifference by
prison officials to a prisoner's serious medical need constitutes
cruel and unusual punishment in violation of the Eighth
Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To
prevail on such a claim, however, Ruocco must allege "acts or
omissions sufficiently harmful to evidence deliberate
indifference" to a serious medical need.  Id. at 106.  He must

17

show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. See Id. at 104-05. Mere negligence will not support a section 1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06). Inmates do not have a constitutional right to the treatment of their choice. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard for convicted prisoners. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom. Foote v. Hathaway, 513 U.S. 1154 (1995). The alleged

18

deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain").  The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition:  "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998) (citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

Defendants do not dispute that Ruocco has a serious medical need.  Thus, for purposes of deciding this motion, the court assumes that the Ruocco's condition satisfies the requirement of a serious medical need.

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, a convicted inmate also must present evidence that,

subjectively, the charged prison official acted with "a
sufficiently culpable state of mind." Hathaway, 37 F.3d at 66.
"[A] prison official does not act in a deliberately indifferent
manner unless that official 'knows and disregards an excessive
risk to inmate health or safety; the official must both be aware
of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw
the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825,
837 (1994)).

The Court of Appeals for the Second Circuit has determined
that, although the Supreme Court has not precisely defined the
duty of a custodial officer "to provide needed medical treatment
to a pretrial detainee, it is plain that an unconvicted
detainee's rights are at least as great as those of a convicted
prisoner." Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996).
Thus, custodial officials may be found liable for violating due
process rights of a pretrial detainee if they deny treatment
because they are deliberately indifferent to that need:

> Deliberate indifference, in this context, may
> be shown by evidence that the official acted
> with reckless disregard for the substantial
> risk posed by the detainee's serious medical
> condition. . . . Thus, in order to establish
> deliberate indifference, a plaintiff must
> show "something more than mere negligence";
> but proof of intent is not required, for the
> deliberate-indifference standard "is
> satisfied by something less than acts or
> omissions for the very purpose of causing
> harm or with knowledge that harm will

result."

    In the context of a claim under the Eighth Amendment, the standard for assessing deliberate indifference is a subjective one, requiring a determination as to whether the official knew of the risk to an inmate's health or safety. . . .  Although the Supreme Court has not stated whether the same standard should be applied in the due process context, this Court in <u>Liscio v. Warren</u>[, 901 F.2d 274 (2d Cir. 1990),] used an objective standard, requiring determination of what the official knew or should have known, <u>see, e.g.,</u> 901 F.2d at 276-77 (despite pretrial detainee's failure to mention his alcoholism, physician was "on notice" that detainee might be suffering from alcohol withdrawal because he exhibited symptoms commonly associated with such withdrawal).

<u>Id.</u> (internal citations omitted) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994)).  Thus, the court must apply a different standard when considering Ruocco's claims for denial of medical treatment during the period when he was a pretrial detainee.

    1.  <u>Defendant Smith</u>

    Defendant Smith, the officer who denied Ruocco his orthopedic footwear upon his arrival at Garner Correctional Institution in February 2000, is the only non-medical officer named in the complaint during the time that Ruocco was a pretrial detainee.  The record reveals that when Ruocco complained about being denied his orthopedic footwear, he was informed that institutional policy prevented inmates from having any items from home.  According to the pertinent policy, if Ruocco required orthopedic footwear, the prison physician must request it.  If

the review committee approved the request, Ruocco would be sent
to an approved vendor and the footwear would be issued to him
through the medical department.

Ruocco neither alleges nor provides evidence that defendant
Smith prevented him from seeking medical authorization for
orthopedic footwear or interfered with the authorization process.
Further, he provides no evidence to suggest that defendant Smith
had medical training sufficient for him to determine whether
orthopedic footwear was medically necessary or that he should
have known that approval would be denied.

Ruocco argues in opposition to defendants' motion that
defendant Smith should have contacted the medical department or
reviewed Ruocc's medical records before requiring Ruocco to send
home his orthopedic footwear.  Ruocco identifies no reference in
the Department of Correction medical records prior to his
transfer to Garner Correctional Institution stating that
orthopedic footwear was medically required.  The releases to
obtain Ruocco's pre-incarceration medical records are dated after
his arrival at Garner Correctional Institution.  Even if the pre-
incarceration records were available, they only state that Ruocco
used a heavy work boot to enable him to walk for any distance.
The court can discern no reference to orthopedic footwear.  Thus,
it is not clear from the pre-incarceration records that Ruocco
needed orthopedic footwear at all times.

22

The court concludes that the mere fact that defendant Smith followed institutional rules, instead of accepting Ruocco's plea to circumvent the process, is insufficient to demonstrate deliberate indifference by defendant Smith to a serious medical need.  Thus, Ruocco has failed to meet his burden to oppose defendants' motion with regard to the claims against defendant Smith.  Defendants' motion for summary judgment is granted as to the claims against defendant Smith.

       2.   <u>Defendant Berkowitz</u>

Defendant Berkowitz provided mental health treatment to Ruocco while he was confined at Bridgeport Correctional Center as a pretrial detainee.  Ruocco does not allege that the mental health treatment was inadequate.  He argues that he should have been provided the medications he received prior to incarceration instead of being treated for opiate withdrawal when the medications were not provided by the medical staff.

The medical records reveal that Ruocco arrived at Bridgeport Correctional Center with self-inflicted scratches on his wrist. Although Ruocco now argues that these scratches were caused by the handcuffs and were not an attempt at suicide, correctional officials handled the situation cautiously and assigned Ruocco to the mental health unit for observation.

In addition, medical records reveal that Ruocco provided contradictory information regarding substance abuse.  Initially

23

he stated that he had never undergone substance abuse treatment. The following day, he stated that he had undergone substance abuse treatment on five occasions.  In opposition to defendants' motion, Ruocco states that he only underwent substance abuse treatment once for a five-day period.  The record contains no reports regarding substance abuse treatment to corroborate any of the three statements.

Ruocco's medical records reveal several requests for mental health treatment and referrals by defendant Berkowitz for examination by a medical doctor.  Ruocco has not presented any evidence to show that defendant Berkowitz was deliberately indifferent to any mental health need.  Thus, defendants' motion for summary judgment is granted as to all claims against defendant Berkowitz.

3.  <u>Defendants Stein and Tung</u>

Defendants Stein and Tung are physicians who treated Ruocco while he was a pretrial detainee.[5]  Defendant Stein treated Ruocco while he was confined at Bridgeport Correctional Institution.  Defendant Tung began treating Ruocco after he was transferred to Garner Correctional Institution.

---

[5]Defendant Tung began treating Ruocco while he was a pretrial detainee and continued to treat him after he was convicted.  Because the applicable legal standard differs for pretrial detainees and convicted inmates, the court considers the claims against defendant Tung for treatment while a pretrial detainee in this section and the claims against defendant Tung for treatment while a convicted inmate in the following section.

Medical records indicate that, despite referrals to medical, Dr. Stein did not see Ruocco until October 6, 1999, over forty days after his admission. Defendant Stein ordered an x-ray of Ruocco's right foot. The x-ray was negative. Dr. Stein did not request Ruocco's pre-incarceration medical records. One attempt to contact Ruocco's pre-incarceration physician by telephone was unsuccessful, but an associate verified Ruocco's pre-incarceration medications. In light of Ruocco's insistence that he had been under treatment for a crushed foot prior to his incarceration, the contradictory indication from the x-ray, Ruocco's constant complaints of pain and the verification of his pre-incarceration medications, the court concludes that there is a genuine issue of material fact whether defendant Stein should have requested Ruocco's medical records and examined him sooner. Accordingly, defendants' motion for summary judgment is denied as to the claims against defendant Stein.

Dr. Tung first examined Ruocco in February 2000, but did not seek his pre-incarceration medical records until at least May 2000. There is no indication in the medical records that defendant Tung made any attempt to contact Ruocco's pre-incarceration physician. In light of Ruocco's history of repeated complaints and the contradictory reports in the record, the court concludes that there is a genuine issue of material facts whether defendant Tung's conduct was objectively

reasonable.  Accordingly, defendants' motion for summary judgment is denied as to Ruocco's claims against defendant Tung for the period when he was a pretrial detainee.

       4.  <u>Defendants Tung, Wright and Giarrantana</u>

Defendants Tung, Wright and Giarrantana are physicians who treated Ruocco after he was convicted.

Medical records reveal that defendant Tung consistently denied requests for orthopedic footwear, stronger pain medication, and a bottom bunk.  Defendant Tung submitted one request, in May 2000, for a neurological examination.  The Utilization Review Committee denied that request and defendant Tung never requested any other examinations.  Once the consulting podiatrist recommended orthopedic footwear, however, defendant Tung submitted the order.  Defendant Tung made notations in Ruocco's medical file indicating that Ruocco demanded narcotic medication and threatened legal action if defendant Tung did not meet these demands.  Ruocco denies making any of these statements.

Considered together, the following evidence demonstrates a genuine issue of material fact regarding the conduct of defendant Tung:  defendant Tung's repeated denials of a bottom bunk pass; his failure to authorize narcotic pain medication and orthopedic footwear at an earlier time; his failure, in light of the discrepancies between the institutional medical file and Ruocco's

statements concerning his previous treatment and condition, to obtain Ruocco's pre-incarceration medical records for four months; and the contradictory statements in the affidavits of Dr. Tung and Ruocco regarding demands for narcotic medications and other treatment.  Thus, defendants' motion for summary judgment is denied as to the remaining claims against defendant Tung.

Defendant Wright treated Ruocco from February 2001 through the spring of 2002.  Defendant Wright issued several temporary bottom bunk passes and prescribed narcotic medications.  In addition, he submitted repeated requests for consultative examinations to the Utilization Review Committee until the committee finally approved the podiatry consultative examination. The medical records also contain an entry from defendant Tung, discontinuing narcotic medication prescribed by defendant Wright two days earlier.  The entry indicates that defendant Wright agreed after a conversation with defendant Tung that Ruocco should not receive the stronger medication.  Ruocco contends that defendant Tung was interfering with defendant Wright's treatment decisions.  Defendant Wright has stated in his affidavit that he agreed with the decision to terminate the medication and was not forced to rescind the order by defendant Tung.

The record indicates that defendant Wright did not disregard a significant risk to Ruocco's medical needs.  He prescribed a bottom bunk pass and narcotic pain medications, and repeatedly

sought consultative examinations.  Dr. Wright was responsible for obtaining approval for the consultative podiatry examination that resulted in issuance of orthopedic footwear.  These actions contradict any claim that defendant Wright disregarded a serious risk of harm to Ruocco.  Defendants' motion for summary judgment is granted as to any claims against defendant Wright.

Defendant Giarrantana replaced defendant Wright in the spring or summer of 2002.  Ruocco disputes defendant Giarrantana's choice of medication and argues that he could not have reviewed the medical file because he did not prescribe the same medications Ruocco had taken prior to his incarceration.

While Ruocco disagrees with the treatment prescribed by defendant Giarrantana, he has provided no evidence to suggest that defendant Giarrantana possessed "a sufficiently culpable state of mind."  Hathaway, 37 F.3d at 66.  The mere fact that the medication prescribed was different from that prescribed two years earlier, before incarceration, or after Ruocco was transferred to Osborn Correctional Institution is insufficient to show that defendant Giarrantana knew and deliberately disregarded facts demonstrating that his conduct posed a substantial risk of serious harm to Ruocco.  Accordingly, the court concludes that Ruocco has not met his burden in opposition to defendants' motion for summary judgment on this claim.  Defendants' motion for summary judgment is granted as to the claims against defendant

28

Giarrantana.

     5.   <u>Defendants Fuchs, Leddy, Evans and Dobson</u>

Defendants Fuchs, Leddy, Evans and Dobson are nurses. Ruocco argues that these defendants should have provided him the medications that had been prescribed by the physicians who treated him before he was incarcerated. Defendants have provided evidence that nurses within the Department of Correction are not permitted to prescribe medication or medically necessary footwear. They are permitted only to dispense medications that have been prescribed by one of the Department of Correction physicians and to carry out orders issued by those physicians.

Ruocco has provided no evidence suggesting that any nurse failed to dispense medications, once those medications were prescribed by a Department of Correction physician. Thus, the court can discern no basis for this claim against defendants Fuchs, Leddy, Evans and Dobson.

In addition, Ruocco contends that defendant Fuchs placed him in a strip cell upon his admission to Bridgeport Correctional Center in August 1999 and did not immediately obtain medical records from his pre-incarceration physicians. Ruocco's medical records indicate that he was admitted to the mental health unit because correctional staff observed self-inflicted scratches on his left wrist. Thus, it appears that defendant Fuchs was following institutional protocol requiring a mental health

29

examination when an inmate exhibits possible signs of suicidal tendencies.

Ruocco's medical records also reveal that upon admission, he was treated for the symptoms of opiate withdrawal and referred to the medical department.  Defendant Fuchs complied with institutional rules and followed the orders of the institutional psychiatrist and physician.  These actions contradict Ruocco's claim that defendant Fuchs was deliberately indifferent to his medical needs and the court can discern no other constitutional right that was violated by defendant Fuchs' actions.

Defendants' motion for summary judgment is granted as to defendants Fuchs, Leddy, Evans and Dobson.

6.    <u>Defendants Gomez, Sparks and Dorsey</u>

Defendants Gomez, Sparks and Dorsey are non-medical correctional officials.  Ruocco contends that he asked each of these defendants to investigate his medical claims and remedy the failure to prescribe the same treatment he was receiving prior to his incarceration.  Defendants argue that summary judgment should be granted for these defendants because they are non-medical correctional officials and relied on the opinions of the medical staff regarding Ruocco's medical care.

Defendant Gomez was the warden of Garner Correctional Institution during the time Ruocco was incarcerated there. Ruocco alleges that, in response to a letter from Ruocco's mother, defendant Gomez relied on the opinions of the medical staff and did not order that he receive the same medications he had received prior to his incarceration.

Prison officials may not substitute their own judgment for that of medical professionals.  <u>See</u> <u>Williams v. Fisher</u>, No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *7 (S.D.N.Y. Sept. 18, 2003)(citations omitted); <u>Johnson v. Wright</u>, 234 F. Supp. 2d 352, (S.D.N.Y. 2002)(citations omitted).  The only exception is "in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or improper treatment."  <u>Bond v. Aguinaldo</u>, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002).  <u>See</u> <u>McEachern v. Civiletti</u>, 502 F. Supp. 532, 534 (N.D. Ill. 1980)

("Lacking the requisite expertise, [prison administrators] must necessarily place their confidence in the reports of prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper.").

The evidence submitted by the parties indicates that, in response to the letter from Ruocco's mother, defendant Gomez contacted the medical department to ascertain that Ruocco was receiving proper medical treatment. The fact that Ruocco's mother disagreed with the treatment being provided is insufficient to preclude defendant Gomez's reliance on the medical opinions he received. Thus, defendants' motion for summary judgment is granted as to the claims against defendant Gomez.

Ruocco alleges that defendant Sparks required him to follow institutional procedures to obtain orthopedic footwear instead of making an exception to the rules and permitting Ruocco's family to send him the footwear that had been sent home. In addition, he faults defendant Sparks for not providing him with orthopedic footwear immediately when a physician noted the need for this footwear in the medical records. Ruocco alleges that it was improper for Sparks to require him to wait for the order to be approved by the review board and the footwear to be ordered from an approved supplier pursuant to the institutional policy.

Again, defendant Sparks is not a medical professional.

Ruocco has not presented any evidence that would require defendant Sparks to deviate from established institutional procedures. Ruocco has filed to meet his burden of demonstrating facts showing that defendant Sparks was deliberately indifferent to Ruocco's serious medical need when he required Ruocco and the medical staff to follow established procedures to obtain orthopedic footwear. Defendants' motion for summary judgment is granted as to the claims against defendant Sparks.

Defendant Dorsey is the Health Services Administrator at Garner Correctional Institution. Ruocco alleges that she did not conduct an independent investigation in response to his complaints. Instead, she arranged for Ruocco to be seen by defendant Tung, the same doctor alleged to be causing his problems. In addition, he alleges that defendant Dorsey failed to respond to several of his grievances in a timely manner.

Defendant Dorsey is not a physician. She did not ignore Ruocco's complaints of improper medical care. Instead, she arranged another medical examination. The fact that the examination was not with a physician of Ruocco's choosing, does not constitute deliberate indifference to his medical needs.

In addition, to the extent Ruocco claims that defendant Dorsey failed to respond to his grievances, Ruocco does not state a cognizable federal claim. "A state cannot be said to have a federal due process obligation to follow all of its procedures;

such a system would result in the constitutionalizing of every state rule, and would not be administrable." <u>Levine v. Torvik</u>, 986 F.2d 1506, 1515 (6th Cir. 1993)(citing <u>Engle v. Isaac</u>, 456 U.S. 107 (1982)), <u>overruled in part on other grounds by</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 111 (1995). Applying the rationale of the Sixth Circuit, the court concludes that Ruocco does not demonstrate the denial of a constitutionally or federally protected right. Defendants' motion for summary judgment is granted as to all claims against defendant Dorsey.

    E.   <u>Failure to Comply with State Court Order</u>

Ruocco alleges that the defendants failed to comply with the state court's orders requiring that the state provide the same medical care Ruocco received prior to his incarceration. Specifically, he alleges that defendants Leddy and Lahda failed to take any action to ensure proper medical treatment when Ruocco informed them that he was not receiving the court-ordered medical treatment. Ruocco argues that the level of his pre-incarceration care was prescribed by notations made by various state court judges on the mittimus for each charge whenever he was transported to court.

The court has reviewed these documents. Each notation requests medical care and medication. At no time did any state court judge indicate that Ruocco must receive the same treatment he had received prior to incarceration. The records supplied by

34

the parties reveal that when Ruocco complained about his
treatment, he was informed that the judges only requested
medication and medical treatment, not the same medications and
medical treatment he received prior to his incarceration.  Ruocco
has provided no evidence suggesting that he sought clarification
of these orders from the state court judges.  Thus, the court can
discern no basis for a claim that defendants failed to comply
with these orders.  Defendants' motion for summary judgment is
granted as to these claims.

     F.   <u>Qualified Immunity</u>

     Finally, defendants argue that they are protected by
qualified immunity.  The court has granted defendants' motion for
summary judgment as to all claims except those against defendants
Stein and Tung.  Thus, the court considers only whether the
actions of these two defendants are protected by qualified
immunity.

     The doctrine of qualified immunity "shields government
officials from liability for damages on account of their
performance of discretionary official functions 'insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'"  <u>Rodriguez v. Phillips</u>, 66 F.3d 470, 475 (2d Cir. 1995)
(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  To
determine whether qualified immunity is warranted, the court

35

first must address the question: "Taken in the light most

favorable to the party asserting the injury, do the facts alleged

show the officer's conduct violated a constitutional right?"

Saucier v. Katz, 533 U.S. 194, 201 (2001).

> [I]f a violation could be made out on a
> favorable view of the parties' submissions,
> the next, sequential step is to ask whether
> the right was clearly established.  This
> inquiry, it is vital to note, must be
> undertaken in light of the specific context
> of the case, not as a broad general
> proposition.

Id.

At the time of the alleged violations of Ruocco's rights,

the law regarding claims of inadequate medical treatment put

defendants Stein and Tung on notice that they could be liable for

violating the Eighth Amendment if they deliberately failed to

give Ruocco medically necessary and available treatment.  See,

e.g., Farmer v. Brennan, 511 U.S. 825, 837 (1994); Estelle v.

Gamble, 429 U.S. 97, 106 (1976).

The court has determined above that there are genuine issues

of material fact regarding the medical care provided by

defendants Stein and Tung.  Resolution of these claims must occur

at trial.  Because the court cannot definitively conclude that

defendants Stein and Tung violated Ruocco's right to adequate

medical care, it cannot resolve this issue.  Accordingly,

defendants' motion for summary judgment is denied on this ground

without prejudice to defendants revisiting the immunity issue at

trial.

IV.  <u>Conclusion</u>

Defendants' Motion for Summary Judgment [**doc. #42**] is **GRANTED in part and DENIED in part.**  The motion is granted as to all claims except those against defendants Stein and Tung. Unless plaintiff files a notice indicating otherwise, the Clerk of the Court shall appoint counsel to represent plaintiff from the Civil Pro Bono Panel.

**SO ORDERED** in Hartford, Connecticut, this 30th day of March, 2004.

/s/DJS

_____
Dominic J. Squatrito
United States District Judge